SO ORDERED: August 26, 2011.



_____
**Anthony J. Metz III
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| FELIX INVESTMENTS, INC., ) | CASE NO. 11-00178-AJM-11 |
| ) | |
| Debtor. ) | |

**FINDINGS OF FACT, CONCLUSIONS
OF LAW AND ORDER GRANTING RELIEF FROM STAY**

This matter came before the Court on July 1, 2011 upon the Motion of GE Capital Franchise Finance Corporation ("GE") for relief from the automatic stay filed on January 20, 2011 and the Debtor's objection thereto wherein GE appeared by its counsel, David Jurkiewicz; the Debtor appeared by counsel, K.C. Cohen.[1]  The Court took ruling on the matter under

---

[1] Also set for hearing on July 1st was :(1) the Debtor's motion to assume lease and exercise purchase option and GE's objection thereto; (2) the Debtor's motion to sell and GE's objection thereto; and (3) the Debtor's motion to incur secured post petition debt and GE's objection thereto.  The parties agreed that disposition of these other matters depends on the Court's decision with respect to GE's motion for relief from stay, and therefore, those matters were not addressed at the July 1st hearing.

1

advisement at the conclusion of the hearing and directed the parties to submit proposed findings of fact and conclusions of law. The parties have complied with that directive.

### *Findings of Fact*

1. On or about August 12, 2002, GE and the Debtor, Felix Investments, Inc. ("Felix") entered into a Master Lease, whereby Felix leased from GE for a term of approximately ten (10) years certain real estate located at 2402 East 38th Street, Indianapolis, Marion County, Indiana ("East 38th"); 3749 East Washington Street, Indianapolis, Marion County, Indiana ("East Washington"); and 6014 East 46th Street, Indianapolis, Marion County, Indiana ("East 46th") (collectively herein, the "Leased Properties".) GE and Felix memorialized the terms of the Lease in that certain Memorandum of Master Lease, dated August 12, 2002, and recorded on August 27, 2002. Each of the Leased Properties housed a Popeye's Chicken restaurant.

2. Evidence as to what persons owned an interest in Felix as of the date the Lease was executed was murky, but testimony at trial and Felix's counsel's proposed findings of fact indicate that Larry Franke owned 100% of the shares of Felix in August, 2002 when the Lease was executed. The Lease itself was signed by "Christian Franke" in his capacity of "president" of Felix.

3. Under the terms of the Lease, Felix agreed to pay to GE rent for the Leased Premises as set forth in Section 5 of the Lease. Section 24(A)(ii) of the Lease provided that Felix's failure to pay rent or other sums due under the Lease, within five (5) days after it is due would be an "event of default" under the Lease.

4. Section 24(A)(v) of the Lease provided that Felix's abandonment or vacation of any of the Leased Premises would be an "event of default" under the Lease, subject to Felix's rights under Section 14 of the Lease. Section 14 of the Lease required Felix to "diligently operate its business" in each of the Leased Properties, but permitted a cessation of business operations for a period not to exceed ninety (90) days. In the event Felix chose to cease operations under Section 14, it was required to give written notice to GE within ten (10) days after Felix made the election to cease operations.

5. Section 27 of the Lease acknowledged that GE relied on Felix's business experience and creditworthiness in entering into the Lease. To that end, Felix was prohibited under this section from transferring a majority of its voting stock, thereby changing the ownership structure of Felix, without GE's prior written consent. That section also provides that any transfer in violation of this section shall be voidable at the sole option of GE.

6. Section 9 of the Lease required Felix to pay, or cause its sublessee to pay, all taxes and assessments of every type assessed against or imposed upon the Leased Properties which in any manner affect in any manner the net return realized by GE under the Lease. This section also required Felix, or its sublessee, to pay all taxes imposed by reason of the use of any of the Leased Properties. The mechanism for dealing with tax assessments under this Section required Felix to provide, or cause its sublesseee to provide, to GE evidence that payment of the tax was made in a timely fashion. In the case of contested tax assessments, Felix was required to deposit with GE adequate reserves to for the payment of the tax.

7. In Section 15(E) of the Lease, Felix covenanted to GE that its use of the Leased Properties shall be in compliance with all environmental laws. Section 23 of the Lease also provided that Felix, at its expense, effectuate remediation of any environmental condition existing on the Leased Properties and that, upon completion of such remediation, obtain an environmental certification no later than 4-1/2 years from the date of the Lease for the East 38th Street location and no later than 7-1/2 years from the date of the Lease for the East Washington and East 46th Street stores. Thus, Felix would have to obtain the environmental certificate for the East 38th Street location no later than February, 2007 and no later than February, 2010, for the two remaining stores.

8. Section 11 of the Lease required Felix to maintain certain types and levels of insurances, and also provided that Felix was to procure and provide to GE, certificates of insurance evidencing Felix's compliance with the insurance requirements.

9. With respect to defaults under the Lease that did not involve the payment of money, Section 24(A)(vi) provided that such a default would constitute an "event of default" unless GE determined in its reasonable discretion that such failure would not constitute an event of default. If GE so determined, it was required to give Felix notice of such and a thirty (30) day period to cure the failure. If Felix failed to cure the default within the 30 days, then an "event of default" would be deemed to have occurred, without any further notice or demand required of GE. If Felix was diligently pursuing a cure of the failure, but failed to cure within the 30 day period, GE , in its reasonable discretion, could allow up to 90 days for Felix to cure. In the event Felix failed to cure the default within 90 days, then an "event of default" would be deemed to have occurred.

10. Section 24(b)(i) of the Lease provided that, upon the occurrence of an "event of default", GE was entitled to exercise all remedies available in law or in equity, including the remedy of terminating the Lease, by which Felix's right of possession of the Leased Properties would be terminated. The Lease, as well, would be terminated as to all aspects other than Felix's liability.

11. Finally, Section 39 of the Lease – the "anti-waiver" clause – provided that no provision of the Lease shall be deemed waived except by a written instrument unambiguously setting forth the matter waived and signed by the party against which enforcement of the waiver is sought.

12. Rodney Bynum ("Bynum") testified that he acquired a 50% interest in Felix and that Will Pace acquired the remaining 50% interest in 2006 or 2007, which would have been well after the Lease was executed. Felix's counsel's proposed findings indicate that in August , 2006, Franke sold a controlling interest in Felix to Rodney Bynum, Will Pace and Jackie Pace. This transfer would have changed the ownership structure of Felix. GE did not receive notice of the Transfer prior to the Transfer taking place and did not provide prior written consent to the Transfer. Nonetheless, GE continued to work with Bynum and Pace.

13. The Popeye's Chicken restaurants that were housed in the Leased Properties were operated by a succession of franchisees (collectively "Franchisees") pursuant to a franchise agreement with AFC Enterprises, Inc. dba Popeye's Louisiana Chicken ("AFC"), the franchisor. Bynum had also owned an interest in the franchisees, but somehow divested himself of that interest in 2008 or 2009 wherein Will Pace became an

owner of the franchisee. During all or a portion of 2009, the franchise that operated the Popeye's Chicken restaurant was National Franchise Developers of Indiana LLC ("National") in which Will Pace held an interest. National later filed a chapter 11 which was dismissed on September 7, 2009. National ceased business operations and closed its registration with the Indiana Department of Revenue ("IDR") on December 31, 2009. National apparently transferred all of its interest in the franchise agreement to Diversified Restaurant Management, LLC ("Diversified") on or about January 1, 2010 and Diversified opened a new registration with the IDR.

14. National itself failed to meet its financial and tax obligations. The IDR obtained several judgments against National which collectively exceeded $2,000,000 for nonpayment of sales and use, wage withholding, food and beverage and corporate income taxes from the period of 2003-2009. On July 23, 2010, Will Pace, as responsible officer of National, and the IDR entered into an "Agreed Entry for Injunction" wherein Pace agreed that all future taxes would stay current. Pace was also given a period of time to make a good faith effort to sell the restaurants. Finally, Pace agreed to be enjoined from doing business in Indiana and from transferring any monies or assets owned by or in his possession as a result of his business activities.

15. In additional to its tax problems, National and/or the Franchisees defaulted on various obligations under the franchise agreement, and, on August 26, 2010, AFC, sent to the Franchisees a "notice of termination" whereby all the franchise agreements were terminated, effective immediately.

16. Given the termination of the franchises needed to operate the restaurants, business operations ceased at the Leased Properties. Jerri Greene, manager of the East Washington location, testified that the East Washington store was open the Tuesday after Labor Day (September 7, 2010) but that the product from that store was transferred to the two other stores at East 38th and East 46th the next day and that the East Washington store closed, then, on September 8, 2010. There was no direct testimony as to when the other stores closed, but there was testimony that the East 38th Street store was the last to close. Given Mr Greene's testimony that he was paid in cash on September 14th, a payday, the Court finds that the East 38th Street store closed no later than September 14, 2010.

17. Felix, likewise, appeared to have a history of defaults under the Lease. Felix's Exhibit D contained six notices of default sent by GE or its counsel between December 14, 2005 and December 5, 2008. The termination of the Popeye's Restaurant franchises that operated in the Leased Properties only aggravated Felix's financial difficulties. The parties stipulated that on September 24, 2010, GE sent written notice to Felix of its default due to failure to pay rent and that counsel for GE on December 1, 2010 sent further written notice to Felix of its failure to pay, requiring Felix to vacate the Leased Properties if such default was not cured within ten (10) days.

18. Having lost the franchises's ability to operate Popeye's restaurants in the Leased Properties, and having received a notice of default from GE, Bynum attempted to find other operators for the restaurants or buyers for the franchises so that the restaurants could reopen and generate funds to pay the rent. Christopher Payne, a business consultant that had worked with AFC and a principal of L P & P Investments ("L P & P")

testified that he made contact with Bynum to discuss taking over the operation of the restaurants. He testified that he submitted to GE in November, 2010, a letter of intent to purchase the Leased Properties but when he got no response, he attempted instead to become the new operator/ franchisee for the restaurants. Diversified was the franchisee of the restaurants at this point.

19. In order to become operator of the restaurants, Payne needed to ensure that any defaults under the Lease with GE with respect to the Leased Properties were cured. Payne testified that he attempted to cure the payment default under the Lease by contacting GE for a payoff figure. He testified that he finally received a payoff figure "at the 11th hour" and that there was difficultly in getting wire transfer instructions from GE. Because of the hurried nature of the transaction, Payne wired to GE and GE received a wire of $46,672.18 on December 8, 2010. However, the wired funds were from PB Management, Inc., ("PB") not L P & P, although it was indicated that the wire was sent on behalf of Felix. PB was wholly owned by Eugene Parker ("Parker"), an attorney. Parker also held an interest in L P & P. Payne followed up with GE regarding receipt of the wired funds with a voice mail message and an email mail message.

20. Although not expressly provided for in the Lease, it was GE's policy to not accept payment from entities other than a borrower ("third party payors") unless and until it performed certain inquiries and was satisfied that there was a logical relationship between the third party payor and the borrower. GE had received financial statements for L P & P and the personal financial statements of its principals, Christopher Payne and Eugene Parker, but had not received any financial statements for PB. In reliance on its

policy, GE determined that it could not accept the funds that PB wired on December 8, 2010 and returned them about 5 to 7 days later. No other payments have been tendered to GE by, or on behalf of, Felix since July 1, 2010.

21. After the wired funds were returned, GE determined that Felix had not cured the default within the 10-day time period.  Thus, it chose to exercise its option under Section 24(B)(i) whereby it terminated the Lease on January 4, 2011 (the "Termination Date"), and sent a notice of Lease termination to Felix.  The parties stipulate that, as of June 30, 2011, the amount due and owing under the Lease from Felix, as of the Termination Date, is $52,022.10.

22. Sometime before January 10, 2011, GE filed an action against Felix in the Superior Court of Marion County (the "State Court") for eviction and damages and to accelerate rents. Felix filed voluntary petition under chapter 11 on January 10, 2011 (the "Petition Date"), the day before the State Court hearing to determine Felix's rights in the Leased Properties.

23. There was also evidence at the hearing that the operator/ franchisee operating the restaurants in the Leased Properties sometime during 2009 and perhaps prior to that was

24. GE filed its motion for relief from stay on January 20, 2011. [2]

25. The parties stipulate that the Leased Properties remain vacant as of July 1, 2011, and that neither Felix nor its tenants or assigns have conducted any business in the Leased Properties since the Petition Date.

---

[2] Although GE's motion was docketed as a "refusal to waive" the 30 day provision in Section 362(e)(1), GE did not expressly refuse to waive its right to a hearing within thirty (30) days of the date its motion was filed.

26. The parties also stipulate that Felix has not received an environmental certification with respect to the Leased Properties as required by Sections 15 and 23 of the Lease.

27. The parties stipulate that Felix has not provided a certificate of liability insurance as required by Section 11 of the Lease.

### *Conclusions of Law*

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. GE argues, in part, that all of Felix's rights under the Lease – including its right to possess the Leased Properties – terminated pre petition and that Felix, therefore, holds merely bare possession of the Leased Properties, without a legal or equitable right to possess them. GE further argues that Felix's expired right to possess the Leased Properties is not property of the estate. *See, e.g.*, *In re Munroe*, 183 B.R. 667, 669 (Bankr. R.I. 1995) ("There is hardly any question that an entity which has no legal or equitable interest in the property and has nothing more but a bare possession has no interest which qualified to be the properties of the estate."). GE concludes that, with no interest that qualifies as "property of the estate", Felix is not entitled to the protections of the automatic stay in its continued possession of the Leased Properties.

3. The Court must look to applicable state law to determine if the lease was terminated pre-petition. *Vanderpark Properties, Inc., v. Buchbinder (In re Windmill Farms, Inc.)*, 841 F.2d 1467, 1469 (9th Cir. 1988); *Kipp v. Depoy (In re Depoy)*, 29 B.R. 466, 470 (Bankr. N.D. Ind. 1983). While each state has its own process for eviction or unlawful detainer,

the general rule throughout the states and is that the lease ends when the tenant is no longer entitled to possession. *Robinson v. Chicago Housing Auth.*, 54 F.3d 316, 321 (7th Cir. 1995) (residential lease).

4.  In Indiana, a commercial lease is to be construed in the same manner as any other contract. *Zawistoski v. Gene B. Glick Co., Inc.*, 727 N.E.2d 790,792 (Ind. Ct. App. 2000); *Loper v. Standard Oil Co.*, 138 Ind. App. 84, 211 N.E.d 2d 797, 800 (1965). Determination of whether a lease has been terminated is made on a case by case basis. *Gigax v. Boone Village Limited Partnership*, 656 N.E.2d 854, 857 (Ind. Ct. App. 1995).

5.  Indiana law governs the Lease and allows for termination of a lease and a tenant's right to possession prior to judicial determination. For instance, under the Indiana Code a "landlord may *terminate* the lease with not less than ten (10) days notice" if the tenant fails or refuses to pay rent. Ind. Code § 32-31-1-6. Moreover, Indiana courts recognize a lessor's contractual right to terminate a lease upon the defaults, whether monetary or nonmonetary, of the lessee. *Ream v. Yankee Park Homeowner's Ass'n, Inc.*, 915 N.E.2d 536, 541–42 (Ind. Ct. App. 2010).

6.  For the reasons stated below, the Court concludes that the Lease terminated pre petition. *Assuming that the automatic stay applies to whatever possessory rights Felix may have under the terminated Lease [3]*, the Court considers whether GE is entitled to relief from the automatic stay under §362(d)(1) and (2). Section 362(d)(1) of the Bankruptcy Code provides for relief from the automatic stay "for cause," and a movant bears the initial

---

[3] See, *Landmark Bank of St. Charles v. Victor Foods, Inc. (In re Victor Foods, Inc.)*, 102 B.R. 727, 728 (Bankr. E. D. Mo. 1989); *In re Sweet N Sour 7th Ave. Corp.*, 431 B.R. 63, 67 (Bankr. S. D. N. Y. 2010)(stay applied to protect debtor's equitable and possessory interests in leased premises in which debtor operated frozen dessert store, even though debtor's leasehold rights terminated pre petition).

11

burden to demonstrate that cause exists. 11 U.S.C. § 362(d)(1). Bankruptcy Code Section 362(d)(1) provides that the court shall grant relief from the stay "for cause, including lack of adequate protection of an interest in property of such party in interest". If relief from stay is sought with respect to an act against property, § 362(d)(2) provides that the stay should be lifted if (a) the debtor does not have equity in the property and (b) such property is not necessary to an effective reorganization.

7. GE concentrates its argument for relief from the stay on three areas in which Felix allegedly defaulted under the Lease: (1) nonpayment of rent and failure to cure (Section 5 of the Lease) (2) cessation of business operations in which Felix failed to notify GE and where cessation of business operations exceeded 90 days (Section 14 of the Lease) and (3) transfer of controlling interest in Felix stock without prior consent of GE (Section 27 of the Lease). However, Felix's defaults are not limited to these three areas as there is evidence that Felix likewise failed to fulfill its Lease obligations with respect to (4) taxes (Section 9 of the Lease) (5) insurance (Section 11 of the Lease) and (6) environmental matters (Sections 15(E) and 23 of the Lease).

8. With respect to the first three areas, Felix does not dispute that events of default occurred, but argues that (1) Felix cured the monetary default of nonpayment of rent when PB wired funds to GE; (2) Felix did not cease business operations for a period exceeding 90 days, as Rodney Bynum continuously sought to find an operator of the stores, and (3) GE waived its right to enforce Section 27 of the Lease regarding transfer of stock ownership in Felix because Felix notified GE of the transfer in 2006 and GE nonetheless resumed business dealings with the new owners.

9. The Court concludes that Felix did not cure the monetary default under the Lease. What was tendered as the cure for nonpayment of rent on December 8, 2010 were funds from a third party payor which was not in contractual privity with GE and for which GE had no financial background. Accepting payment from a third party payor under these circumstances was against GE's policy, even if such a policy was not disclosed in the Lease. GE claims in its reply filed on February 14, 2011 in support of its relief from stay motion that it informed Felix, prior to the wire having been sent, that GE "would not and could not" accept funds from a third party. *Reply in Support of Motion of GE Capital Franchise Finance Corporation for Relief from the Automatic Stay* (Doc #39) page 4, ¶8. There was no direct testimony regarding whether GE so informed Felix, but regardless of that fact, the Court concludes that GE rightfully refused the funds. Felix did not thereafter cure the monetary default and therefore an "event of default" occurred under Section 24(A)(ii) of the Lease.

10. The Court likewise concludes that Felix indeed ceased business operations for a period more than 90 days in violation of Section 14 of the Lease. Felix failed to provide written notice to GE of its intent to cease business operations within ten (10) days of making such a decision as required by Section 14 of the Lease. Even if it had, the 10 day notice would have allowed Felix only a 90 day window in which to cease business operations. Felix stipulates to the fact that it failed to comply with the Lease requirements regarding the actions it was to take if it ceased operations. Felix's argument that Bynum's efforts to find a new operator/ franchisee to operate stores in the Leased Properties constitutes a continuation of business operations is simply not credible in light of its stipulation that

the Leased Properties remain vacant. Unless an approved operator/ franchisee is selling chicken in the Leased Properties, there is no business operation. Felix remains in default of Section 14 of the Lease.

11. The Court also concludes that GE did not waive its right to enforce Section 27 of the Lease which prohibits transfer of ownership in Felix without GE's prior written consent. Section 39 of the Lease -- the "anti-waiver" clause – provided that no provision of the Lease shall be deemed waived except by a written instrument unambiguously setting forth the matter waived and signed by the party against which enforcement of the waiver is sought. Felix admits that a controlling interest in it was transferred but does not allege or has not produced a written instrument exists in which GE unambiguously waived the provisions of Section 27 of the Lease. Felix has not argued or demonstrated that this Court should not enforce Section 27 and therefore remains in default of Section 27 of the Lease.

12. The Court also concludes that Felix breached its Lease obligations with respect to taxes, insurance and environmental certifications under respective Lease Sections 9, 11, 15(E) and 23. Felix has stipulated that it failed to obtain the environmental certification and the certificate of liability insurance. As for its tax obligations under the Lease, Section 9 not only requires Felix to pay taxes assessed directly against it, but also requires Felix to "cause its sublessee" to pay "all taxes , charges, license fees and similar fees imposed by reason of the use of any of the [Leased] Properties" by Felix which includes all taxes arising from the operation of the restaurants. The IDR holds a large judgment against National for nonpayment of sales, use, food and beverage and corporate income taxes.

        The Court concludes that Felix is in default of its obligations under Section 9 of the Lease.

13.     The Court has concluded that, at a minimum, Felix breached its obligations under Sections 5, 9, 11, 14, 15(E), 23 and 27 of the Lease. Sections 24(A)(ii), (v) and (vi) of the Lease render such breaches "events of default". GE is entitled to terminate the Lease and Felix's right to possession upon the occurrence of an "event of default" under Section 24(B)(i).

14.     Having concluded that the Lease terminated, along with Felix's rights thereunder, the Court further concludes that "cause" exists to lift the automatic stay under §362(d)(1). The Lease terminated pre petition and despite Felix's and its counsel's noble efforts, this Court cannot resurrect it. See, *Chart House, Inc. v. Maxwell (In re Maxwell)*, 40 B.R. 231, 236 (N. D. Ill. 1984); *DePoy*, 29 B.R. at 470. Felix heavily relies on L P & P's assumed ability to cure all defaults under the Lease as well as the presumption that AFC will grant L P & P a franchise to operate the restaurants. Unfortunately, there is no "live" lease for L P & P to assume.

15.     Furthermore, the Court must make mention at this juncture that, even if the Lease had not been terminated, there still would have been cause to lift the stay. Evident at the hearing was the fact that corporate formalities with respect to many business transactions were not diligently followed. Bynum was unsure of how he divested his interest in National, but testified that he did so in 2008 or 2009, yet National's chapter 11 petition dated June 7, 2010 is signed by "Rodney Bynum" as "Member". There was testimony that both National and Diversified, at different times, was the franchisee that operated the

15

      restaurants but there was no documentary evidence related to how one transferred its interest in the franchise agreement to the other. There was evidence, however, that National ceased to operate no later than December 31, 2009. Yet, it is National that, on January 27, 2011, purportedly granted L P & P a security interest in the personal property of the restaurants as part of proposed motion to sell Felix's assets and the assumption and assignment of the Lease to L P & P, and Bynum signed that security agreement on behalf of National. The Court questions how Bynum has authority to bind National if he no longer has any ownership interest in it, and also questions how National can grant L P & P a security interest if it has ceased operations and was dissolved in late 2009. Furthermore, Christopher Payne testified that he had not negotiated with Diversified in attempting to purchase the franchise to operate the restaurants, yet, according to the evidence in the hearing, it was Diversified that is the current holder of the franchise.

16. Equally troubling is the fact that the defaults under the Lease were not limited to a specific area. For example, had the default related only to payment of rent, perhaps that cash flow difficulty could have been rectified.. Here, however, the defaults fall along the wide spectrum of taxes, insurance, environmental matters, cessation of business and transfer of interests in addition to the nonpayment of rent. The same can be said for the operating franchises. At a minimum, there is evidence that, between 2003 and 2009, National incurred significant liabilities for the failure to pay a variety of taxes: sales, food and beverage, use, withholding, and corporate income. It appears to the Court that whoever was "running the store" failed in many areas to operate the restaurants and manage the business and failed to remedy many shortcomings when given the chance to

do so, whether it involved the wire transfer of funds or some other default under the Lease. The actions of GE in refusing the tendered wire transfer that purportedly cured the nonpayment of rent was not directed solely at Felix. For some reason, there was no attempt on the part of any of the players - Bynum, Pace, Parker or Payne - to thereafter have PB transfer those tendered funds to Felix so that GE's policy on third party payors could be avoided.

17. Felix, the debtor here, earns its revenue by collecting rent from subtenants who operate a Popeye's Chicken franchise on the premises. Felix is at least $50,000 in arrears on its rent owed to GE. Felix's subtenants are gone, having lost their Popeye's Chicken restaurant franchise and the stores have "gone dark". There has been no business activity in the Leased Properties since September 14, 2010, almost an entire year. Felix currently realizes no revenues. Although L P & P's efforts to winterize the Leased Properties and revitalize the franchise are commendable, the fact remains that the Lease has been terminated and the Court cannot resurrect rights that were terminated pre petition. The stay will be lifted to allow GE to enforce its remedies with respect to the Lease in state court and it will be GE's decision whether it wishes to pursue business opportunities with L P & P.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, as follows:

(1) GE's motion is GRANTED and the automatic stay is hereby lifted with respect to, GE so that GE may exercise its non-bankruptcy rights with respect to the Leased Properties located at (i) 2402 East 38th Street, Indianapolis, Marion County, Indiana, (ii) 3749 East Washington

Street, Indianapolis, Marion County, Indiana, and (iii) 6014 East 46th Street, Indianapolis, Marion County, Indiana as described in more detail in the Motion; and

(2) The other motions set for hearing on July 1, 2011 are MOOT in light of the grant of GE's motion.

# # #

Distribution:

David Jurkiewicz, Attorney for GE Capita Franchise Finance Corp.
KC Cohen, Attorney for the Debtor